# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| ARTHUR L. POCH | CIVIL ACTION NO. 10-33 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| UNUM GROUP, ET AL | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM OPINION

The instant ERISA case stems from a suit for long-term disability benefits, administered under a welfare benefit plan. Before the Court are motions for a decision on the stipulated record, filed by the Plaintiff, Dr. Arthur L. Poch ("Dr. Poch"), and the Defendants, Unum Group and Provident Life and Accident Insurance Company (collectively referred to as "Unum"). [Record Documents 37 and 39]. The Plaintiff's motion urges the Court to find that Unum's denial of his disability benefits was arbitrary and capricious, and thus requires reversal, whereas Unum's motion submits that its denial of disability benefits was not arbitrary and capricious, but rather is supported by the administrative record. Because the Court finds that Dr. Poch has failed to exhaust his administrative remedies, this action will be **DISMISSED** without prejudice.

I.      <u>Factual and Procedural Background.</u>

Dr. Poch is a gastroenterologist who practices with GastroIntestinal Specialists ("GIS") in Shreveport, Louisiana.  [Record Document 36, p. 1].  Dr. Poch has three disability policies with Unum.  <u>Id.</u>  The first policy, effective July 1, 1987, bears policy number 06-355-784754 and provides total disability benefits of $12,000.00 per month. <u>Id.</u> at 2.  The second policy, effective November 1, 1989, bears policy number 06-337-7021298 and provides total disability benefits of $3,000.00 per month. <u>Id.</u>  The third and final policy, effective August 1, 1992, bears policy number 06-337-7089685 and provides for total disability benefits of $1,575.00 per month. <u>Id.</u> at 1.  The parties agree that each of the disability policies defines total disability as:

> (1) You are not able to perform the substantial and material duties of your occupation; and

> (2) You are receiving care by a physician which is appropriate for the condition causing the disability.

<u>Id.</u> at 2.

In November of 2008, Dr. Poch notified Unum that he was filing a disability claim.  Attached to his initial claim packet was an Attending Physician Statement from Dr. M. E. Millstead ("Dr. Millstead"), in which Dr. Millstead indicated that Dr. Poch complained of multiple joint pain, primarily affecting the left basal joint of his thumb.  [Record Document 24, Exhibit 4, p. 39].  Dr. Poch informed Dr. Millstead

that as a gastroenterologist, his primary duties were to perform endoscopies and Endoscopic Retrograde Cholangiopancreatogram procedures ("ERCP"). Id.  These procedures required "continuous manipulative use of the thumb on the involved left hand" and involved Dr. Poch "manipulating the scope on a constant basis while he is performing this type of procedure." Id.  Dr. Millstead opined that if Dr. Poch continued to perform these procedures "with the activity level that he does . . . this will continue to worsen the articular damage." Id. at 41.  Indeed, in Dr. Millstead's opinion, unless Dr. Poch altered his work activities, the "arthritis will become more and more severe to the point where he will have constant pain and even need surgical intervention with prosthetic replacement of the basal joints of the thumbs." Id.

On November 24, 2008, Unum responded to Dr. Poch's claim, requesting a claimant statement, along with a signed medical authorization to begin the claim process.   Id. at 35.   When Unum received no response to the November correspondence, it sent another letter to Dr. Poch on December 24, 2008, again requesting a claimant statement and a signed medical authorization.  Id. at 47. Again, no response was received.  On January 7, 2009, Unum sent a third letter to Dr. Poch, requesting the same information, however, this letter was returned as undeliverable.  Id. at 50, 53.  On January 20, 2009, a fourth letter was sent to Dr.

Poch, requesting the same information as the previous letters. Id. at 57.  In response,

on January 28, 2009, Dr. Poch's attorney, John Hammons ("Hammons") called

Unum and advised that Dr. Poch's claim forms were being completed and would

be returned to Unum within two weeks. Id. at 60.  On February 12, 2009, once the

two week period ended without receipt of Dr. Poch's documentation, Unum closed

the claim. Id. at 62.  Subsequently, on May 30, 2009, Unum received Dr. Poch's

documentation, and it reopened the file. Id. at 65-86.  Included in Dr. Poch's

documentation was an attorney representation letter from Mr. Hammons, in which

he states that:

> Dr. Poch is no longer able to perform the substantial and material
> duties of his occupation as a gastroenterologist and is receiving care by
> a physician which is appropriate to the condition causing his disability.
> A vital part of Dr. Poch's practice is endoscopy and particularly the
> performance of ERCPs for treatment of patients who require advanced
> biliary pancreatic endoscopic interventions.   He has developed
> debilitating osteoarthritis in both hands and feet including the loss of
> cartilage in both hands and particularly in the left thumb.
>
> . . .
>
> Dr. Poch's practice has involved a disproportionately large number of
> endoscopies, particularly ERCPs.  The osteoarthritic problems in both
> hands prevent him from performing those procedures in a safe and
> effective manner and . . . preclude him from performing the substantial
> and material duties of his occupation as a gastroenterologist
> particularly with regard to his inability to perform this level and type
> of endoscopy.  Dr. Poch should, therefore, be deemed to be totally
> disabled under the terms and conditions of his policies of disability . .
> .

Id. at 70, 72.

Mr. Hammons included a letter from Dr. Forrest Wall, a plastic surgeon whom Dr. Poch consulted for a second opinion.  Id. at 84.  Dr. Wall noted that the X-rays demonstrated "marked osteoarthritis in the first CMC joint" and that Dr. Poch suffered from "classic first CMC joint arthritis in his left thumb."  Id.  Dr. Wall recommended treatment with anti-inflammatories, steroid injections, and possibly ultimately joint replacement.  Id.  In addition to the correspondence from Dr. Wall, there were letters from two of Dr. Poch's partners–- Dr. David Phillips and Dr. David Dies.  Both letters stated that Dr. Poch performed the majority of ERCPs conducted at GIS.  Id. at 85-86.  As further corroboration of Dr. Poch's claim, Dr. Dies specifically related that upon examining Dr. Poch's hand following an ERCP, he noticed "both visible and palpable edema not only in that joint but in the surrounding soft tissue.  It was objectively and subjectively painful and warm."  Id. at 86.

The claim documentation also included a letter to the GIS partners from Dr. Poch himself, in which he explained that he would no longer be performing ERCPs or "referrals that are likely to result in advanced biliary pancreatic endoscopic interventions."  Id. at 77.  Because of his medical condition, Dr. Poch revealed that he would be transitioning to "half-day endoscopy."  Id.  Dr. Poch stated, "I believe

that I need to give up this important part of my practice. . . .  This change in my practice pattern represents a substantial departure from my previous practice." Id. Dr. Poch's claim form confirms this change in his practice.  Indeed, it reflects that although he continued to work as a gastroenterologist, he had to discontinue ERCP procedures and limit other endoscopy procedures to half-day, rather than performing endoscopies full-day.  Id. at 99, 102.

Dr. Poch's claim file was assigned to Tina Giacobbi ("Giacobbi"), a Disability Benefits Specialist at Unum.  On June 4, 2009, Giacobbi attempted to contact Mr. Hammons by phone, but learned he was out on vacation.  [Record Document 24, Exhibit 5, p. 6].   The following day, on June 5, 2009, Giacobbi sent Dr. Millstead a letter in which she requested Dr. Poch's entire medical file, from the first office visit to the present.  Id. at 38.  On June 8, 2009, Giacobbi wrote to Mr. Hammons, informing him that she would be handling Dr. Poch's disability claim and outlining the benefits for each of the three disability policies Dr. Poch had with Unum. Because Dr. Poch was claiming total disability, which required him to be unable to perform the substantial and material duties of his occupation, Giacobbi requested additional information to determine Dr. Poch's duties.  Specifically, she inquired about the duties he performed before the onset of his disability; the duties he performed after the onset of his disability and how often those duties were

performed; the duties he could not perform as a result of his disability; the date of Dr. Poch's disability; a summary of the Current Procedural Terminology ("CPT") codes from one year prior to the onset of disability through the present; and tax returns from one year prior to the onset of the disability through the present. Id. at 83. Giacobbi's letter further states that Unum is "committed to making a prompt decision on Dr. Poch's claim . . . [and] will determine his eligibility for benefits as soon as reasonably possible following receipt of all necessary documentation." Id. at 84.

Giacobbi also requested that Stephen Snelson ("Snelson"), an Unum field representative, schedule a meeting with Dr. Poch and Mr. Hammons in order to conduct a claim interview. [Record Document 24, Exhibit 6, p. 90]. Snelson attempted to reach Mr. Hammons on several occasions before Mr. Hammons responded on June 19, 2009. Id. at 90, 97. At that time, Snelson and Mr. Hammons discussed interview dates, although Mr. Hammons needed to consult Dr. Poch's schedule before confirming a specific date. Id. at 97.

On that same day, Mr. Hammons returned Giacobbi's phone call to discuss Dr. Poch's claim. However, according to Giacobbi's notes of the conversation, Mr. Hammons informed her that "he has spent more time suing Unum and had a lot of frustration with the company when Provident was running things." Id. at 98.

Following that statement, Mr. Hammons and Giacobbi discussed the additional documentation that Giacobbi required in order to process Dr. Poch's claim, including the CPT codes and tax records.  Id. at 99.

On June 26, 2009, Snelson met with Dr. Poch and Mr. Hammons to conduct the claim interview.  [Record Document 24, Exhibit 7, p. 18].  Snelson's report relays that Mr. Hammons "immediately pointed out that he was not a proponent of UNUM and said that he had been involved in numerous litigations against the company.  He said that his initial telephone call with the Disability Benefit Specialist did not lead him to believe that this claim would be any different."  Id. at 19.  During the actual interview, Dr. Poch confirmed that he was seeking total disability benefits, as the ERCP procedure was a substantial part of his duties and he was the only physician in his practice to conduct said procedure.  Id.  With respect to his pre-disability work duties, Dr. Poch represented that he previously performed eight to ten procedures per day.  However, aside from his inability to perform ERCP procedures, Dr. Poch instructed that his medical practice was otherwise unchanged.  Id. at 20.  During this meeting, Dr. Poch and Hammons provided Snelson with the 2006, 2007, and 2008 CPT codes Giacobbi had requested, but failed to provide the 2009 codes.  Id. at 20, 32.  The 2009 codes were necessary to compare Dr. Poch's pre-disability procedures with his post-disability procedures.

On July 7, 2009, Giacobbi contacted Mr. Hammons, both by phone and by letter, about this missing information, as well as to remind him to provide the requested tax records.  Id. at 32, 48-49.  On July 13, 2009, Mr. Hammons responded by providing the 2009 CPT codes.  Id. at 56.  The information Unum had received thus far was forwarded internally to a CPT analyst and a vocational rehabilitation consultant for review in order to discern whether the ERCP procedures and full-day endoscopies were, in fact, a material and substantial part of Dr. Poch's work duties prior to his disability.  Id. at 64, 83.

On August 4, 2009, Giacobbi sent Mr. Hammons another follow-up letter, again reminding him that she needed Dr. Poch's tax records.  Id. at 83.  Unum's records reflect that on August 11, 2009, Mr. Hammons contacted Giacobbi, who was unavailable to take the phone call.  The notes of Tomasina Crumsey, who evidently received Mr. Hammons' phone call, reflect that Mr. Hammons was upset by Giacobbi's request for Dr. Poch's tax records and further that "unless this matter is handled in 10days [sic] he will file suit."  Id. at 111.  The following day, in a phone conversation between Giacobbi and Mr. Hammons, Giacobbi explained that the tax records were necessary in order to have independent verification of employment and to verify all sources of employment.  Id. at 113.  Mr. Hammons informed Giacobbi that he would not provide Dr. Poch's tax information.  Id.  He also stated

that Unum had received letters from Dr. Poch's partners at GIS regarding the volume of ERCP procedures Dr. Poch previously performed and asked Giacobbi if she "was calling these doctors liars." Id. According to Giacobbi's notes, Mr. Hammons "then indicated that we have everything we need and we have 10 days to make a decision or else he is filing suit." Id. When Giacobbi informed him that the CPT codes were still under review, Mr. Hammons expressed his opinion that the CPT codes were not even important in assessing Dr. Poch's disability claim. Giacobbi explained that an analysis of the codes was necessary to determine whether the ERCP procedures were a substantial and material duty of Dr. Poch's occupation. Id. at 113-14. Despite this explanation, Mr. Hammons reiterated that Unum had ten days to complete its review of Dr. Poch's claim or he would file suit. Id. at 114.

On August 13, 2009, Giacobbi relayed to Mr. Hammons the results of the CPT code analysis, which revealed that ERCP procedures comprised only a small percentage of Dr. Poch's pre-disability practice and that the CPT codes demonstrated no decline in the number of endoscopies Dr. Poch was performing post-disability. [Record Document 24, Exhibit 8, p. 13]. In order to understand the discrepancies between Dr. Poch's view of his duties and the CPT code analysis, Giacobbi requested additional information relating to the following: (1) when is an

ERCP performed and what type of patients require this procedure; (2) what tests, if any, are performed to assess whether a patient requires an ERCP; (3) was Dr. Poch the physician who actually performed the procedures listed in the CPT codes, or did another doctor conduct the procedures under Dr. Poch's supervision; (4) in the event Dr. Poch did not perform all of the procedures, which procedures did he not perform; (5) is there a "lag time" between the time Dr. Poch performs a procedure and the time when it would appear on his CPT billing information; and (6) any other information that would help explain the relationship between ERCP procedures and the rest of Dr. Poch's practice.  Id. at 14.

On that same date, Holly Crawford ("Crawford"), an Unum representative, contacted Mr. Hammons to discuss the findings of the CPT analysis and the need for additional information.  Id. at 20.  Mr. Hammons returned Crawford's call the following day, at which time Crawford explained that the CPT analysis did not reflect that Dr. Poch was performing a great number of ERCP procedures prior to his disability, nor did the codes reflect a post-disability decrease in the number of endoscopies.  Id. at 27.  Mr. Hammons represented that he would investigate some possible reasons for these discrepancies and provide Unum with further clarification.  Id. at 27-28.  When Unum received no response from Mr. Hammons, Giacobbi sent a follow-up letter on September 11, 2009, reminding him of the

discrepancies and the need to provide clarification. Id. at 33-34. Giacobbi requested

that Mr. Hammons respond by October 26, 2009. Id. at 33.

Near the end of September, Crawford and Mr. Hammons again spoke on the

phone about the information Giacobbi had requested.  Id. at 36-38.  According to

Crawford's notes of the conversation, she reminded him that

> he was going to obtain some additional information for us.  We needed
> to know how the ERCP related to the other procedures that Dr. Poch
> performs.  He said that he had the information but he was not going to
> send it to us because we won't review it and this is a farce.  I told him
> that we would in fact review it and that we would not have asked for
> it if we did not plan to review it.  Mr. Hammons stated that our request
> for information is nothing but a stall tactic and that he knows this to be
> the case. . . .  He said the bottom line is that he does not trust Unum.
> He has never seen us pay a claim.  I told him that I have been with the
> company a long time and that's not my experience.  My experience is
> that we pay most of the claims we receive.  He said that he had truly
> tried to work with us but he knows that we are not going to pay Dr.
> Poch's claim so he is going to sue us.  He said it is the 'same attitude
> with all of us.'

Id. at 36-37.

By November 3, 2009, Mr. Hammons still had not provided Unum with the

requested information.  Accordingly, on that day, Giacobbi contacted him both by

phone and letter to explain that, in the absence of additional documentation and/or

clarification, Unum did not find Dr. Poch eligible for total disability benefits.

[Record Document 24, Exhibit 10, pp. 39-40, 42- 48].  According to Giacobbi's notes

of the phone conversation, Mr. Hammons stated that he "assumed this would end

up in court- that he would rather that- he indicated that he could be representing a quadriplegic that is blind and we wouldn't consider him disabled. He indicated that he has the lawsuit prepared and would be filing tomorrow." Id. at 40.

The denial letter issued by Unum explained that although the medical information demonstrated that Dr. Poch's restrictions and limitations prevented him from performing ERCP procedures, it did not appear that ERCP procedures were considered a substantial and material duty of Dr. Poch's occupation. Id. at 43. Further, Unum instructed that the CPT codes showed no decrease in endoscopy procedures. Id. "Accordingly, it does not appear that the restrictions and limitations that are supported in the medical records have precluded Dr. Poch's ability to perform the substantial and material duties of his predisability occupation." Id. Unum's denial letter stated that if Dr. Poch had additional information to support his disability claim, Unum would "be happy to reconsider your claim." Id. at 47. In that event, Dr. Poch was required to furnish the information to Unum within 180 days of the date he received the denial letter. Id. If Dr. Poch did not have additional information to submit to Unum, but rather disagreed with and wanted to appeal Unum's decision, he was required to submit a written appeal within 180 days. Id. The letter further explained:

> You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will

have access to all relevant documents as defined by applicable U.S. Department of Labor regulations.  The review will take into account all new information, whether or not presented or available at the initial determination.   No deference will be afforded to the initial determination.

The review will be conducted by us and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate.

Id. at 47-48.  Dr. Poch was advised that if his appeal was denied, he would have the right to bring a civil action under ERISA, but that "this administrative appeal process must be completed before you begin any legal action regarding your claim." Id. at 48.  Finally, Dr. Poch was notified that if he failed to appeal within 180 days, Unum's claim determination would be final.  Id.

Dr. Poch did not appeal Unum's decision, but rather filed suit in state court on December 2, 2009, seeking a determination that he is totally disabled under the terms of his disability policies and that he is entitled to disability benefits, along with attorneys' fees and penalties for the arbitrary and capricious denial of his disability benefits.  [Record Document 1, Exhibit 1, pp. 7-8].  Unum removed the case to federal court on January 1, 2010, citing federal jurisdiction under the ERISA provisions, as well as diversity jurisdiction.  [Record Document 1].  Pursuant to instructions contained in a September 21, 2010 scheduling order [Record Document 35] issued by Magistrate Judge Hornsby, both parties submitted the instant motions

for a decision, based upon the stipulated facts and the administrative record.  In Dr. Poch's motion, he insists that Unum's denial of his disability benefits was arbitrary and capricious, such that he is entitled to the requested relief.  Unum, on the other hand, insists that its denial of benefits was not arbitrary and capricious, as the administrative record demonstrates that Dr. Poch's medical condition does not prevent him from performing the substantial and material duties of his job.  In addition, and of great significance to this Court's decision, Unum has raised the affirmative defense of failure to exhaust administrative remedies.

II.    Standard of Review Under ERISA.

This Court has previously determined that the disability policies at issue are governed by ERISA.  [See Record Documents 32 and 33].  ERISA authorizes a civil action by a participant "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).  The standard of review is governed by the language of the plan itself.  A denial of benefits in an ERISA plan is generally reviewed under a *de novo* standard.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948 (1989).  However, when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," this court will apply an abuse-of-discretion standard.  Id. at 115, 109 S.Ct. at 956-57.   Here, the parties agree that the disability policy provided that

Unum was the administrator of the policy and had discretionary authority to determine eligibility for benefits.  Accordingly, abuse of discretion is the appropriate standard of review.

In the ERISA context, abuse of discretion is synonymous with arbitrary and capricious.  See Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 342 (5th Cir. 2002). A decision is arbitrary and capricious "only if made without a rational connection between the known facts and the decision or between the found facts and the evidence."  Meditrust Fin. Servs. Corp. v. Sterling Chem., Inc., 168 F.3d 211, 215 (5th Cir. 1999) (internal marks omitted).  Under this standard of review, the Court should affirm an administrator's decision if it is supported by substantial evidence. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2004) (internal marks omitted).  An administrator's decision must "fall somewhere on a continuum of reasonableness- even if on the low end."  Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 297 (5th Cir. 1999).

Before the Court can review the administrator's decision, however, the plaintiff must first exhaust all administrative remedies.  See Denton v. First Nat'l Bank of Waco, 765 F.2d 1295, 1300-03 (5th Cir. 1985).  Although ERISA itself contains

no exhaustion requirement, <u>Wilson v. Kimberly-Clark Corp.</u>, 254 F.App'x 280, 285 (5th Cir. 2007), the Fifth Circuit has expressly ruled that a "claimant who is denied benefits under an ERISA plan must exhaust all administrative remedies afforded by the plan before instituting litigation for recovery of benefits." <u>Lacy v. Fulbright & Jaworski</u>, 405 F.3d 254, 256 (5th Cir. 2005). This requirement is in place in order to: (1) uphold Congress's desire to have ERISA trustees rather than federal courts be responsible for the actions of plan administrators; (2) provide a clear record of the administrative action; and (3) allow judicial review under the abuse of discretion standard, as opposed to *de novo*, "to keep from turning every ERISA action, literally, into a federal case." <u>Denton</u>, 765 F.2d at 1300; <u>Bourgeois v. Pension Plan for the Emp. of Santa Fe Int'l Corps.</u>, 215 F.3d 475, 479 n. 4 (5th Cir. 2000). The exhaustion requirement is excused when exhaustion would be futile or the remedy is inadequate. <u>Id.</u>; <u>Hall v. Nat'l Gypsum Co.</u>, 105 F.3d 225, 232 (5th Cir. 1997); <u>see</u> <u>also</u> <u>Baptist Mem'l Hosp.-Desoto Inc. v. Crain Auto., Inc.</u>, 392 F.App'x 288 (5th Cir. 2010)(excusing failure to exhaust administrative remedies because the plan failed to provide notice that it denied the claim). However, as the Fifth Circuit has explained, "a failure to show hostility or bias on the part of the administrative review committee is fatal to a claim of futility." <u>McGowin v. Manpower Int'l, Inc.</u>, 363 F.3d 556, 559 (5th Cir. 2004)(citing <u>Bourgeois</u>, 215 F.3d at 479-80).

III.     Analysis.

In the instant case, Unum notified Dr. Poch of its decision in a letter dated November 3, 2009.  It said he had the right to submit additional documentation to support his claim and/or he had the right to appeal the denial of his disability benefits.  If Dr. Poch desired to appeal the decision, the letter advised him he had to do so in writing within 180 days.  Further, the denial letter described the appeal process:

> You will have the opportunity to submit written comments, documents, or other information in support of your appeal.  You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations.  The review will take into account all new information, whether or not presented or available at the initial determination.   No deference will be afforded to the initial determination.
>
> The review will be conducted by us and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate.

[Record Document 24, Exhibit 10, pp. 47-48].

Here, Dr. Poch does not dispute that he failed to appeal the denial of his disability benefits.  Rather, he contends that doing so would have proved futile, as "[n]o one is required to do a vain and useless thing!"  [Record Document 44, p. 5].  In support of that notion, Dr. Poch argues that "a cursory analysis of Unum's conduct in the handling of this case, not to mention the claims history of Unum and

its predecessor, Provident Insurance Company, reveals bad faith inherent within Unum's claims handling and decision-making process."  Further, he asserts that

> The conduct, attitude, and actions taken by Unum in response to Dr. Poch's claim for disability benefits demonstrates that the system of claims review by Unum was so inherently flawed, unjust, arbitrary and capricious that pursuing any 'available' administrative remedies within the Unum corporate system would be an utterly vain and useless endeavor.

Id. at 6.  As further justification, Dr. Poch alleges that once Unum denied his disability claim, it committed a breach of contract, which relieved him of the obligation to seek administrative review.

Dr. Poch's arguments are flawed and fail to support the futility exception. Indeed, his brief makes clear that his notion of futility is premised upon preconceived notions, Mr. Hammons' alleged past dissatisfaction with Unum, and overall, unsubstantiated speculation.  Plainly, it is not supported by actual facts and evidence, as required to demonstrate futility.  See Smith v. Unum Life Ins. Co. of Am., 2008 WL 4549717, *8 (S.D.Miss. Oct. 10, 2008) (rejecting plaintiff's claim that exhaustion was excused because Unum was "predisposed" to deny her claim).

Based upon the Court's review of the administrative record, particularly Unum's processing of Dr. Poch's claim and the frequent correspondence with Dr. Poch and Mr. Hammons regarding the claim, there is no indication in the record that Unum did not properly consider Dr. Poch's claim, or that it would have been

unwilling to appropriately reconsider it in the future.  It bears mentioning that Mr. Hammons's conduct seems to have exacerbated the situation, in that he refused to provide Unum with the information it requested and then ceased communications altogether.[1]  Though he was undoubtedly advocating for his client, these actions impeded and eventually terminated the claims process.  With no further information to rely upon, Unum ultimately denied the claim.

Nonetheless, as previously discussed, Dr. Poch was offered the opportunity to supplement the record with additional information and have Unum reconsider its denial.  Thus, it is clear that Dr. Poch could have supplemented the record with the information that Unum initially requested and Unum <u>could</u> <u>have</u>, though not necessarily would have, reached a different result.[2]  As an alternative to, or in combination with, a request for reconsideration, Dr. Poch was offered the opportunity to appeal the decision and receive a fresh review by a new person.  No discretion was going to be given Giacobbi's previous determination.  Again, Dr. Poch chose to forego this course of action, and instead filed suit, despite the fact that he was warned that he was required to appeal before filing suit.

---

[1] Whether or not Mr. Hammons agreed with the necessity or propriety of the requested information is of no moment.  The fact remains that his conduct essentially brought the claims process to a grinding halt.

[2] Whether or not Unum would have reached a different result is speculative, as it undeniably was not allowed the opportunity to reconsider its decision.

After a thorough review of the administrative record, the Court finds that Dr. Poch has failed to present competent evidence to demonstrate that it would have been futile for him to appeal the denial of his disability benefits.  Rather, all the Court is presented with is unsubstantiated speculation and allegations, which fail to satisfy the futility exception.

In addition, the Court rejects Dr. Poch's belief that Unum breached its contract by denying his claim, thereby relieving him of the obligation to seek administrative review.  To be sure, Dr. Poch could not <u>unilaterally</u> decide that Unum breached its contract with him by denying his claim and thus consider himself free from the legal requirement of exhausting his administrative remedies.  To allow plaintiffs who disagree with the administrator's decision to engage in this course of action would render meaningless the exhaustion requirement.  Furthermore, it is not Dr. Poch who ultimately determines whether a breach of contract occurred, but rather a court of law.

IV.   <u>Conclusion.</u>

For the foregoing reasons, the Court concludes that Dr. Poch did not comply with Unum's procedures in appealing the denial of disability benefits, and therefore, failed to exhaust his administrative remedies.  Accordingly, his claim against Unum

for disability benefits is **DISMISSED without prejudice**.   Any other motion

pending before the Court is **DENIED as moot**.   A judgment consistent with the

terms of this Memorandum Opinion shall issue herewith.

   **THUS DONE AND SIGNED** on this 26th day of September, 2011.


ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE